## MATTER OF SCHAAD

## In VISA PETITION Proceedings

### A-12780495

*Decided by Board May 25, 1964*

Since there is no common-law marriage under the law of Hungary, no relationship was created between petitioner and beneficiary by reason of the latter's extra-marital cohabitation with petitioner's mother from 1944 until their marriage in 1960. A valid stepparent-stepchild relationship was not created until the formal marriage in 1960 at which time petitioner was 28 years old. Consequently, petitioner is not a stepchild within section 101(b) (1) (B), Immigration and Nationality Act, as amended, and is ineligible to petition for second preference quota status on behalf of beneficiary as her stepfather.

The case comes forward on appeal from the order of the District Director, New York District, dated November 22, 1963 affirming the original order of denial dated March 20, 1963 and certifying the case to this Board.

The petitioner, a native of Hungary and a naturalized citizen of the United States, 32 years old, female, seeks preference quota status under section 203(a) (2) of the Immigration and Nationality Act on behalf of her stepfather, a native and citizen of Hungary, 70 years old, male. In support of the visa petition there was submitted a marriage certificate showing that the petitioner's mother and her stepfather were married at Budapest, Hungary on June 9, 1960. According to our prior order of May 24, 1963, the District Director, New York District, denied the visa petition on the ground that the beneficiary cannot be considered the petitioner's father or parent as defined in section 101 (b) (2) of the Act because the petitioner was 28 years of age when her mother and the beneficiary were married in 1960, thereby creating the status of stepparent and stepchild; as a consequence thereof, she is not a child as defined in section 101(b) (1) (B) of the Act.[1]

At oral argument on May 9, 1963 the petitioner's representative, her husband, asserted that the beneficiary and the mother of the petitioner

---

[1] Section 101(b) (1) (B) defines the term "child" to include a stepchild provided the child had not reached the age of 18 years at the time the marriage creating the status of stepchild occurred.

lived together as husband and wife from 1944 until their marriage at Budapest, Hungary on June 9, 1960. He alleged that under Hungarian law the relationship of the petitioner's mother and the beneficiary ripened into the status of a common-law marriage after they had lived together continuously for a period of one to five years. The case was remanded in order to afford the petitioner an opportunity to establish that her mother and her stepfather acquired the status of common-law husband and wife under the law of Hungary in 1944 when the petitioner would have been 13 years of age and that a valid relationship of stepparent and stepchild under the immigration laws was created.

The memorandum of the District Director supporting the decision of denial of November 22, 1963 indicates that petitioner was advised to submit any evidence possible that would be pertinent to the issue of when she acquired the status of stepchild. She submitted a letter from a lawyer in Budapest, Hungary stating in effect that if two persons had been living together in a common-law relationship and subsequently entered into a valid marriage, their commonly owned property is disposed of as if they had been married from the beginning of their common-law relationship. This letter cited a ruling of the Supreme Court of the Hungarian People's Republic published in August 1962. In his letter the Hungarian lawyer states that the court decision sets forth that where parties have lived together and have acquired commonly owned property during the period of living together, and only in cases where the parties have ultimately married and their common-law relationship has grown into marriage, will the unity and continuity of their entire economic situation warrant the application of the rules relating to married couples. The District Director concluded that nowhere was it set forth that the Hungarian court sought to apply this legal fiction generally to all common-law relationships which ultimately ripened into a legal marriage nor had the court ruled that the subsequent marriage of the parties could operate retroactively to create a legal relationship nunc pro tunc from the date of its very inception; to the contrary, if a true common-law marriage had been entered into, there would be no necessity for a subsequent legal marriage. The District Director concluded that the evidence submitted pertinent to the issue of when the petitioner acquired the status of stepchild is not sufficient to warrant a change in the original order of denial and affirmed the original order of denial dated March 20, 1963.

At oral argument on February 5, 1964 the petitioner's husband submitted two translated documents. The first document dated December 6, 1963 at Budapest, Hungary from Dr. Laszlogree to the effect that the petitioner's mother, a widow, and her daughter, the petitioner, up to the date of the marriage of the latter, lived in joint housekeeping with the second husband of the widow, Lajos Schaad, in an apartment

at a certain address in Budapest starting from the year 1944 and that they are continuing to live together. The second document submitted is a certificate to substantiate the report of change of permanent residence by Hungarian male citizens issued by the Hungarian police on August 1, 1945 and shows that the beneficiary and his landlord, Mrs. Kalman Jarfas (the petitioner's mother) reside at the same address in Budapest, Hungary. The Board explained to the petitioner's husband that he should have submitted the documents to the field office. In view of the disposition which we made of this case, it is believed that a remand to consider the newly offered evidence is unnecessary.

Under date of May 8, 1964 a report entitled "Legal Aspects of Extra-Marital Cohabitation in the Hungarian People's Republic," prepared by Dr. William Solyom-Fekete, European Law Division, Library of Congress, was received. The report indicates that the Hungarian Marriage Law was adopted in 1894 [2] and remained in force with amendments until 1952. This law does not mention common-law marriage and no other statute enacted prior to World War II contained any provision on this subject. Therefore, the decisions of the Royal Curia (Supreme Court of Hungary) in which the customary law of the country was expressed, are the only source from which pertinent information may be gathered. On May 7, 1906 the Royal Curia held that according to the continuous judicial practice in Hungary, extra-marital cohabitation of a man and woman, as a sexual relation contrary to the moral opinion of the community, cannot give rise to a civil law claim enforceable before the courts.

The Marriage Law of 1894 was repealed in 1952 when the legislature enacted the Law on Domestic Relations.[3] This law is still in force today and although this Law on Domestic Relations includes no reference to common-law marriage, its commentators usually do discuss its aspects, especially from the viewpoint of property relations.

In 1959 the Civil Code of the Hungarian People's Republic was enacted which entered into force on May 1, 1960.[4] This statute has completely changed the legal system of Hungary which until then was unique in continental Europe. The edict implementing the Civil Code [5] not only repealed all statutes pertaining to civil law, but also such court decisions. Section 5 of this edict even prohibited the "interpretation of the provisions of the Civil Code according to the legal principles formulated in the practice of the judiciary previous to the entering into force of the Code."

[2] Law No. XXXI of 1894.
[3] Law No. IV of 1952 on Marriage, Family, and Guardianship.
[4] Law No. IV of 1959.
[5] Edict No. 11 of 1960.

Although the Law on Domestic Relations is not a part of the Civil Code, the courts apply the same rule in other fields of the law, and regard all earlier court decisions as superseded or repealed, and the Supreme Court revised even its own opinions on the subject of domestic relations, repealing or amending some of them in 1961. Consequently, the decision of the Royal Curia handed down on April 7, 1906 may not be regarded as a valid ruling. To facilitate the understanding of the distinction between a valid marriage and extra-marital cohabitation, the parties thereto will be called "spouses" (*házastárs*) and "cohabitants" (*elettars*, literally translated : life-partners), respectively.

The report then sets forth several cases where the cohabitant is recognized in regulations dealing with tenancies, widow's pensions, the inclusion in criminal law of the cohabitant under the concept of relatives although distinguishing it where the statute simply mentions the term "spouse," court suits *in forma pauperis*, and in matters of inheritance.

The Supreme Court reversed the trend in lower court decisions which were inclined to equate the property relationship of cohabitants with those of spouses by using the analogy of conjugal community property, holding that although the relation of persons living in extra-marital cohabitation cannot be regarded as immoral, or as one negating rights, and the socialist law protects the cohabitant, and assures certain rights, usually financial benefits, nevertheless, the legal and other distinctions between persons living in a marriage and in extra-marital cohabitation must be stressed. In a similar question the Supreme Court held that according to Section 27 of the *Csjt.* (Law on Domestic Relations) conjugal community of property may only occur between *spouses;* between parties to an extra-marital cohabitation, only a community of acquisition may occur. Other cases were cited which dealt with joint acquisitions by cohabitants living together in an extra-marital cohabitation.

After the enactment of the Civil Code the principles of judicial practice as expressed in earlier court decisions were no longer applicable and the Supreme Court rendered a series of decisions and opinions in which the Court rephrased or rewrote some of the more important problems of the court in order to bring the solution of these problems in line with the Civil Code and the principles laid down therein. In the course of this work the Supreme Court restated its position on the general attitude and on the property relations arising from extra-marital cohabitation by stating that section 51 of the Hungarian Constitution provides that the Hungarian People's Republic protects the institution of marriage and family. It recognized cohabitation or extra-marital relationships which continued for

long periods as obtaining certain rights arising from such extra-marital cohabitation. These decrees recognized the similar ancillary rights mentioned previously of the right of the cohabitant of a deceased tenant to continue with the tenancy of a dwelling and regarding the cohabitant as a relative in regard to the application of the *Ptk.* (Civil Code). It stated however that the protection of interests in certain relations identical to that of spouses however does not mean completeness and identity. It was pointed out in this respect that the Hungarian legal system does not guarantee the right of the cohabitant to alimony, to bear the name of her cohabitant, and to intestate inheritance, and it does not regard the relation of cohabitants as having identical merit as marriage.

The Supreme Court expressed its opinion several times to the effect that the legal and other distinctions existing in principle between spouses and parties to an extra-marital cohabitation must be stressed, therefore, the relation of cohabitants may not be regarded as legally identical with the relation arising from a marriage. It was further stated that the application of the rules of Chapter 4 of the Law on Domestic Relations to the settlement of property relations between cohabitants which arose during their cohabitation may only take place if the parties subsequently contracted a marriage and, thus, their relation as cohabitants grew into a marriage, when the unity and continuity of their joint husbandry justifies the application of the rules pertinent to spouses to the liquidation of their entire legal relationship. If this is not the case, cohabitants may not invoke the application of the measures of family law applicable to spouses to the settlement of their property relations, but the rules of civil law shall apply to the adjudication of mutual claims arising from their cohabitation.

. In summary, the report from the Library of Congress indicates that while the parties to an extra-marital relationship or cohabitation do have some recognition for various collateral purposes incidental to the relationship, the distinction between a spouse and a cohabitant is firmly drawn in the Hungarian Law between persons living in a marital status and those in extra-marital cohabitation. The protection of interests in certain extra-marital relations, or cohabitants, as opposed to that of spouses, does not mean completeness of identity. The Hungarian legal system does not guarantee the right of the cohabitant to alimony, to bear the name of her cohabitant, and to intestate inheritance. It is concluded that although the extra-marital relationship of cohabitants is recognized for some purposes under Hungarian laws, it is not equivalent to the relationship existing between legally married spouses.

In the instant case, it is claimed that an extra-marital relationship arose in 1944 but that the parties actually did not become legally married until 1960. We think it proper to conclude that until there was a ceremonial marriage in 1960 between the beneficiary and the petitioner's mother, there was no valid relationship of stepparent and stepchild between the two. During the period the extra-marital relationship existed, no relationship of stepparent and stepchild was created between the beneficiary and the petitioner. It is concluded that the petitioner did not become a stepchild until 1960 when she was 28 years of age and that under the immigration laws, the relationship of stepchild and stepparent was not created within the limitation of 18 years of age. The petitioner is not eligible to file a petition for her stepparent.

ORDER: It is ordered that the order of the District Director, New York District, dated November 22, 1963, affirming the order of denial dated March 20, 1963, be and the same is hereby approved.