MATTER OF HASSAN

In Visa Petition Proceedings

A–8258751

*Decided by Board September 9, 1976*

(1) In order for a child to confer immediate relative status upon a parent under the provisions of section 201(b) of the Immigration and Nationality Act, the petitioning child must be a United States citizen at least 21 years of age, and qualify as a "child" as defined in section 101(b) of the Act.

(2) Beneficiary, the natural father of a United States citizen petitioner, obtained a divorce in 1950 at the Royal Egyptian Consulate located in New York. Notwithstanding the fact that the divorce occurred in a foreign consulate in the United States, it was not a foreign divorce. Therefore, the principle of international comity is not involved, and the divorce is subject to the requirements of full faith and credit. Since this divorce was not obtained in accordance with applicable New York statutory provisions it was invalid in the State of New York, was not entitled to full faith and credit in any other jurisdiction, and was invalid for immigration purposes.

(3) Since the beneficiary's divorce was invalid in the United States (notwithstanding the fact it was valid in Egypt), beneficiary was not free to contract a valid marriage with petitioner's mother in the United States so as to legitimate the petitioner and enable him to confer immediate relative status on his father. Under the circumstances revocation of the approval of the visa petition was proper.

(4) *Matter of H—*, 6 I. & N. Dec. 470 (BIA 1954) reaffirmed.

ON BEHALF OF PETITIONER:
Arlene Tuck Ulman, Esquire
1730 Rhode Island Avenue N.W.
Washington, D.C. 20036

ON BEHALF OF SERVICE:
George Indelicato
Appellate Trial Attorney

The United States citizen petitioner applied for immediate relative status for the beneficiary as his father under section 201(b) of the Immigration and Nationality Act. The petition was initially approved; however, after due notice to the petitioner, the approval was revoked by the District Director in a decision dated January 15, 1975. The petitioner has appealed. The appeal will be dismissed.

The issue in this case is whether the beneficiary, the natural father of the petitioner, is entitled to immediate relative status under section 201(b) of the Act, as the "parent" of an adult United States citizen. Counsel has offered two alternative arguments in support of the petition.

In the first argument, counsel assumes that the petitioner must once have been the "child" of the beneficiary within the statutory definition,

in order to confer immediate relative status, under section 201(b), upon the beneficiary as a "parent." See sections 101(b)(1) and (2). She contends that the petitioner, although born out of wedlock, was legitimated according to the requirements of section 101(b)(1)(C). Counsel's alternative argument is that even if the petitioner was not legitimated, there is no congressional directive that the petitioner must have qualified as the "child" of the beneficiary in order to confer benefits, as an adult, upon his parent. Moreover, counsel contends that the intent of Congress to unite families would be subverted if that requirement is read into section 201(b). We turn first to counsel's contention that the petitioner is the legitimated son of the beneficiary.

The beneficiary, Mr. Hassan, is a native and citizen of Egypt. He entered the United States in 1948 as the servant of an official assigned to the Egyptian Embassy in Washington, D.C. The beneficiary's wife, whom he had married in 1946 in Cairo, Egypt, did not accompany him to the United States.

On December 4, 1950, the beneficiary went to the Royal Egyptian Consulate in New York City and obtained an irrevocable divorce from his Egyptian wife. One year later, he married a United States citizen in the State of Maryland. A petition to accord him immediate relative status was filed by his American wife in 1952. It was denied by the District Director on the ground that the beneficiary's consular divorce was not valid for immigration purposes and that he was not free, therefore, to marry in the United States. The petitioner appealed that decision to this Board; we affirmed the District Director's decision in *Matter of H—*, 6 I. & N. Dec. 470 (BIA 1954).

In the present appeal, taken some 20 years after our decision in *Matter of H—*, *supra*, we are once again concerned with Mr. Hassan's consular divorce. In the present context, the petitioner's claim to legitimated status must be evaluated in light of our holding in *Matter of H—*, *supra*. The registration of the petitioner's birth indicates that he was officially acknowledged by the beneficiary shortly after his birth on January 15, 1953. It is counsel's contention that the petitioner was legitimated under the laws of his residence, the District of Columbia, when his father, Mr. Hassan, entered into a common-law marriage with his mother in the District in the mid-1950's. Quite obviously, unless we now find that Mr. Hassan was free to enter into the alleged common-law marriage, we cannot accept counsel's theory. In short, we are urged to overturn *Matter of H—*, *supra*, and to extend belated recognition to the beneficiary's consular divorce for the following two reasons.

First, counsel contends that the Board's characterization of the beneficiary's divorce as a "consular divorce" [1] (a decree granted at a foreign

---

[1] For a succinct discussion of the reasons underlying the invalidity of the "consular divorce" in this country, see Puente, *The Foreign Consul and His Juridical Status in the*

consulate within the United States) is inaccurate. According to counsel, although the proceeding was commenced in New York City, it was concluded, some three years later, in Egypt. Moreover, it was a proceeding in which both parties participated and over which the rendering authorities in Egypt had competent jurisdiction. Thus, it is more precisely characterized as a foreign divorce. As such, recognition of its validity becomes a matter of international comity. If recognized by the jurisdiction most concerned with the effect of the decree, namely, the beneficiary's residence at the time of the proceeding, it must be recognized for immigration purposes.

Second, counsel contends that the Board erred in holding that the beneficiary was a resident of New York, and that, as a consequence, New York law governed the validity of the divorce. Counsel maintains that the beneficiary's residence was the District of Columbia. Therefore, as a corollary to the first argument, counsel contends that recognition of the foreign divorce must be assessed in light of the laws and policies of the District of Columbia.

We observe, at the outset, that unless we find that the beneficiary's divorce was a foreign judgment, and not a consular divorce, as counsel contends, we need not discuss the choice of law issue. For if the divorce is, as we held in *Matter of H—, supra,* a consular divorce, granted in usurpation of New York's traditional and exclusive authority in matrimonial matters over persons within her borders, it cannot be recognized by the District of Columbia. It is axiomatic, under the principle of full faith and credit, that no jurisdiction can adopt, as valid, a divorce decree which is void in the jurisdiction where rendered.

Therefore, the pivotal issue in counsel's first argument is whether the beneficiary's divorce was a "New York" divorce, obtained in a consulate in New York or whether New York was only coincidentally the site of the institution of divorce proceedings which eventually culminated in a final decree of divorce issued by an Egyptian court in Egypt.

To assist us in answering this question, we have asked the Library of Congress to provide us with information on the Egyptian law of divorce. From a memorandum submitted, we have learned that in Egypt, marriage and divorce are performed by a government official called al-Ma'zun. According to Article 31 of the "Ordinance for the Ma'zuns," (Egyptian Official Gazette, No. 25 of February 27, 1915):

> The Ma'zun must register the divorce exactly as the divorcer has pronounced it without any change in its wording.

In situations which involve the marriage or divorce of Egyptian

*United States* (Burdette J. Smith and Company, Publishers, 1926). For pertinent commentary from the United States Department of State, see Whiteman, *Digest of International Law,* Vol. VII, pp. 621–625.

nationals abroad, the Egyptian consuls are empowered to perform the same functions which the Ma'zuns are assigned in Egypt. Under Article 16 of the "Consular Law" (Egyptian Official Gazette, No. 78 of August 13, 1925), the consul is authorized "to draw the pronouncements of divorce and attest their authenticity . . ." (subsection 3).

The record indicates that Mr. Hassan went to the Royal Egyptian Consulate in New York on December 4, 1950, and pronounced himself irrevocably divorced from his Egyptian wife before the presiding consul. Two years later, in connection with a visa petition filed on his behalf, he presented as evidence of the termination of his first marriage, a certificate issued by the Egyptian Consulate. In this certificate, which was issued on November 5, 1952, the Egyptian Consul attested to the validity, under Egyptian law, of the divorce which had been concluded two years earlier. Reference to the "Consular Law," mentioned above, indicates that this attestation by the consul, acting in his capacity as Ma'zun, was clearly authorized. The substance of this certificate is set out below.

This is to certify that Mr. A _____ O _____ H _____ was married on December 5th, 1946 at Cairo, EGYPT, to Miss E _____ I _____ A _____, and was divorced from said wife on December 4th, 1950. *This divorce was concluded at the office of the Royal Consulate General of Egypt in New York, U.S.A.*, in conformity with stipulations of the Egyptian Law and entered in the Divorce Records under No. 20 (Emphasis added.)

Despite the fact that the certificate recites December 4, 1950, as the date on which the divorce was "concluded" according to Egyptian law, counsel maintains that the divorce was not finalized until 1953. In support of this assertion, she had provided a document in Arabic with two English translations. This document, issued by the Shari'a court of Abdeen in Egypt under the seal of the Ministry of Justice, records the remarriage of the beneficiary's first wife by a Ma'zun on February 25, 1953. Both translations state that the bride "was divorced from Mr. Ahmed Osman Hassan on December 4, 1950, in the presence of Mr. Ahmed Abdul Aziz Sherif, Consul, at the Consulate General in New York." [2] The translations further state that this divorce was certified or approved by the Egyptian Ministry of Justice on February 24, 1953, the day before the remarriage.

On the basis of this document, counsel argues that the divorce was not final and binding upon the beneficiary until it was certified in 1953. More importantly, she argues that when it was certified, it constituted a

---

[2] In commenting upon the original Arabic version of this document, the author of the Library of Congress memorandum noted that the divorce which was pronounced by the beneficiary in New York City was an irrevocable divorce (Ba'in in Arabic). Unlike the revocable divorce (Raj'i in Arabic), the marital status of the parties to an irrevocable divorce is terminated instantly.

19

"foreign" decree of divorce, recognizable in United States courts under the doctrine of international comity. We cannot agree.

Our materials on Egyptian law indicate that the document which counsel has submitted is in the nature of an administrative record. It registers the remarriage of the beneficiary's ex-wife; it also reflects compliance on the part of the Egyptian wife, upon remarriage, with registration requirements contained in the "Ordinance of the Ma'zuns." It does not refer to a certification of the divorce, in the sense of "give effect to"; it simply refers to the registration in the Shari'a court of a divorce obtained abroad.

Specifically, the law of Egypt requires the recording or registering of a divorce with a Ma'zun or in a Shari'a court. Article 33 of the "Ordinance of the Ma'zuns" reads:

> If the separation [between the couple] reached the Ma'zun who performed the marriage and he has the register of marriage in his possession, he shall enter the divorce at the bottom of the marriage folio. *But if this Ma'zun did not perform [originally] the marriage and the marriage register is not in his possession, he must in this case notify the Shari'a court or the Ma'zun [who performed the marriage] in order to note the divorce in the proper register.*
>
> This provision is not operative if the marriage resulting in separation did not take place either in Egypt or in the Sudan. [Emphasis added.]

Therefore, although the "Consular Law" empowers the consul to register the divorce when pronounced in a foreign country, the divorce must also be registered with the Ma'zun who performed the marriage or in the appropriate Shari'a court. Moreover, if the divorcee wishes to remarry, Article 28 of the "Ordinance of the Ma'zuns" requires her to prove to the Ma'zun who presides over the marriage ceremony that her divorce from a previous husband has been duly recorded.

> The Ma'zun is not allowed to perform a marriage contract of a divorcee with another husband unless he sees the document (folio) of her divorce, or the final judgment in it.
>
> But if anything of that sort has not been presented to the Ma'zun, he must refer the matter to the Shari'a judge and follow whatever order he receives. The judge may allow the conclusion of the marriage if, according to the investigation he effected, it has been proven that there were no objections to it. Then the Ma'zun should specify in the marriage contract, the date, number and the place where the divorce has taken place, or the date of the permission given [by the judge] to perform the marriage. [Article 28.]

The document which counsel has provided indicates that the Ma'zun who remarried the beneficiary's first wife was satisfied that her divorce had been properly recorded with the Shari'a court, on the day before he performed the ceremony. As a consequence, there were no instructions from the Shari'a judge indicating that the divorce's validity had been questioned. As Article 28 directs, the Ma'zun noted in the marriage contract, the date and place of the party's divorce. The date given was December 4, 1950; the place, New York.

Therefore, after reassessment, we have concluded that the reasoning

in *Matter of H—, supra,* remains sound. Although the document provided by counsel removes all doubt that the divorce was recognized as valid in Egypt, it does not alter our conclusion that "the doctrine of comity would appear to have no application, since, notwithstanding the fact that the divorce occurred in a foreign consulate in the United States, it was not a foreign divorce, and insofar as its recognition by the State of Maryland with respect to the subsequent marriage, is subject only to the requirement of full faith and credit . . . ," *Matter of H—, supra,* at 472.

Hence, while counsel has presented persuasive evidence that the Board erroneously assumed, in *Matter of H—, supra,* that Mr. Hassan was a resident of New York when he obtained his divorce, we cannot conclude that this evidence impacts on the outcome of the decision. Even if the beneficiary has been a resident of the District of Columbia at all times, the divorce must still be denied recognition. For just as the District must extend its recognition to a decree validly rendered in a sister state, under the doctrine of full faith and credit, so too must it deny recognition to a decree which is void under the law of the jurisdiction where it was issued.[3]

In an alternative argument, counsel contends that the petitioner need not qualify as a "child" within the statutory definition in order to confer immediate relative status upon his father under section 201(b) of the Act. We cannot agree.

Section 101(b) of the Immigration and Nationality Act of 1952 provided interrelated definitions of the terms "child" and "parent" which would govern their use in Titles I and II of the statute. In Title II of that Act, parents were merely accorded preference status under section 203(a)(2). Moreover, section 203(a)(2) referred only to parents of United States citizens "at least twenty-one years of age."

It was not until the term "parent" arose in another context, without the age restrictions, that the Board had an occasion to determine precisely the nature of the interrelationship between the two definitions—parent and child. *Matter of G—,* 8 I. & N. Dec. 355 (BIA 1959), concerned the use of "parent" within section 7 of the Act of September 11, 1957 (P.L. 85-316). Section 14 of the same Act directed that the definitional provisions contained in subsections (a) and (b) of section 101 of the 1952 Act apply to section 7 of the 1957 law. Therefore, the Board had squarely before it the question of what "circumstances" within section 101(b)(1) lead to the creation of the status of "parent." (See definition of parent in section 101(b)(2).) In light of the steadily liberalizing policy of the Congress to unite and preserve the immigrant's family

---

[3] In light of our holding that the beneficiary's first marriage was not validly terminated, we need not address counsel's contention that the beneficiary's second marriage in 1951 to a United States citizen was void, ab initio.

unit, the Board held that the "circumstances" referred to in section 101(b)(2) referred only to the events in subsections (A) through (E) which create a child-parent relationship. Those circumstances include: a legitimate birth, the creation of a steprelationship, legitimation, illegitimate birth in relation to the mother, and an adoption. The term "circumstances" does not refer to the words "unmarried" or "under twenty-one years of age." Therefore, "While for immigration purposes a 'child' ceases to be a child even if it fits into the various categories when it reaches the age of twenty-one or becomes married, the parent, *once the required relationship has been established*, always remains a parent." *Matter of G—, supra*, at 359. (Emphasis added.)

In *dicta*, the Board also noted that if the age and marital restrictions in the definition of child were read into the definition of parent, the provisions in the 1952 Act giving parents a preference would also have to be restricted to the parents of adult *unmarried* citizens since section 203(a)(2) refers to parents of citizens over 21 but makes no mention of marital status. In light of Congress' clear intent to unite the families of immigrants, such a restriction appeared unwarranted. In keeping with these observations, the Board held in *Matter of Schaad*, 10 I. & N. Dec. 555 (BIA 1964), that a 32-year-old married petitioner could not confer preference status under section 203(a)(2) on her stepfather, *because* the steprelationship had not been created before the petitioner reached the age of 18, as section 101(b)(1)(B) requires. The petitioner's age and marital status were clearly not relevant to the denial.

In 1965, Congress created the provision which the present petitioner invokes to confer immigration benefits upon his father. This provision, section 201(b),[4] in effect, reaffirmed the terms of section 203(a)(2) of the 1952 Act while elevating the parents of citizens over 21 from "preferred" to "nonquota" status. Thus, the new amendment enables the parents of adult United States citizens, as well as the spouses and children, to enter this country as "immediate relatives," without numerical limitation. As part of Title II of the Act, the new provision's use of the terms "child" and "parent" is governed by the definitions set out in sections 101(b)(1) and (2).[5] Hence, in discussing the applicability of the term

[4] "The 'immediate relatives' referred to in subsection (a) of this section shall mean the children, spouses, and parents of a citizen of the United States: *Provided*, That in the case of parents, such citizen must be at least twenty-one years of age. The immediate relatives specified in this subsection who are otherwise qualified for admission as immigrants shall be admitted as such, without regard to the numerical limitations in this Act."

[5] Counsel points out that while section 14 of the 1957 Act expressly directed that the definitions of section 101(a) and (b) of the 1952 Act apply to section 7 (the provision at issue in *Matter of G—, supra*), there is no provision which preserves those definitions with reference to section 201(b), as amended. A careful look at section 14, however, indicates that the definitions were only applied to those sections of the new law which were not incorporated into Titles I and II of the 1952 Act. Congress apparently saw no reason to

"parent" to the new provision, the Board concluded in *Matter of Citino*, 12 I. & N. Dec. 427 (BIA 1967), that the decision was governed by our earlier decision construing the interrelationship between the terms "parent" and "child," e.g., *Matter of G—*, *supra*. Applying the holding in *Matter of G—*, *supra*, to the issue in *Citino*, we held that the petitioner, a 33-year-old married woman, could confer 201(b) status on her stepmother since the steprelationship had been created within the requirements of section 101(b)(1)(B). The opposite result was reached in cases involving the same issue when the parent-child relationships were not created in accordance with (A) through (E) of section 101 of the statute. See *Matter of Polidoro*, 12 I. & N. Dec. 353 (BIA 1967), and *Matter of Huerta-Leon*, Interim Decision 2367 (BIA 1975).

We find no support within the statute nor in our decisions for counsel's contention that section 201(b) in Title II of the Act need not be read in conjunction with the definitions in Title I. Inasmuch as the petitioner, in this case, has never qualified as a "child" for immigration purposes, he cannot bestow immediate relative status, as an adult, upon the beneficiary.

Accordingly, the appeal will be dismissed.

ORDER: The appeal is dismissed.

Irving A. Appleman, Member, Concurring

I concur in that portion of the majority decision which finds that the parent-child relationship under section 201(b) of the Immigration and Nationality Act is governed by the same definition as in the case of an adopted child, *Matter of Caramanzana*, 12 I. & N. Dec. 47 (BIA 1967), stepchild, *Matter of Schaad*, 10 I. & N. Dec. 555 (BIA 1964), or son or daughter, *Nazareno v. Attorney General of the United States*, 512 F.2d 936 (C.A.D.C. 1975).

I also agree that so far as this record is concerned we are confronted with a purely "consular divorce" in the United States, invalid under the law of the State of New York, and one to which full faith and credit could not be given by the District of Columbia.[1] The Board recognized in the

---

reiterate the fact that the section 101 definitions were automatically applicable to the parts of the new Act which were incorporated into the existing framework of Titles I and II. For the same reason, there was no need to include an express provision applying the definitions of parent and child to section 201(b), as amended, in 1965, since, the definitions themselves are prefaced with the sentence—"As used in Titles I and II." In short, the absence of a preserving clause cannot be seen as an indication that Congress severed the existing connection between the two provisions.

[1] Contrary to the contention of counsel, there is substantial evidence that Hassan Sr. was domiciled in New York at the apartment of his wife, although working in the District of Columbia at the time the divorce was obtained. However, the domicile is unimportant, and the divorce would gain no stature even if Hassan had been residing in the District of Columbia at the time.

original *Hassan* decision (*Matter of H—*, 6 I. & N. Dec. 470) that the consular decree might well be recognized as valid in Egypt. Petitioner has submitted two widely divergent translations of an Egyptian document. The net effect of a reading of the translations is that the Egyptian authorities did indeed recognize as valid the divorce obtained in the New York consulate. There is a dirth of any evidence that the parties to the divorce, or their representatives, secured a *foreign* divorce in a manner which can be recognized here under principles of comity.

That should end the inquiry so far as this Board is concerned. The further majority discussion of Egyptian divorce law, is both confusing, and unnecessary, in my opinion. Foreign law is a matter of fact, to be proved as evidence. Here the Board has, on its own, obtained a memorandum of law from the Library of Congress, which it has then proceeded to rely on heavily, adversely to the petitioner—and without showing it to the parties prior to decision. One can recognize the necessity for the Board requesting such a memorandum in some circumstances not present here [2] but the practice of rendering an opinion based on the memorandum, without the parties seeing it and having a chance to comment, is most questionable.

In addition, it will be noted that the present claim is based on an alleged common-law marriage between Hassan Sr. (the beneficiary) and one Frances Mae, beginning sometime prior to the birth of the petitioner in 1953 and allegedly continuing until 1959. Frances Mae Hendricks (the petitioner's mother according to his birth certificate) and Frances Robinson (referred to as the petitioner's mother by Hassan Sr.) presumably are one and the same person. However, the record indicates that Frances also had a prior existing marriage and there is no proof whatsoever of the termination of *that* marriage. Thus, even assuming the impediment to a common-law marriage ceased as to Hassan Sr., it has not been shown to have ceased as to his claimed, common-law, "wife." Nor has any evidence been submitted to prove a true common-law marriage even assuming no impediment as to either party.

With the record in this state, the majority discussion of esoteric Egyptian and Islamic divorce law is a needless exercise, and, since it is based on a Library of Congress memorandum received into evidence at the Board level, without briefing or scrutiny by the parties, it may quite possibly be an erroneous one as well.

The case has appealing aspects. The petitioner is a United States Marine Corps veteran who enlisted at the age of 18. It is alleged that the beneficiary supported and raised the petitioner from infancy, and that Hassan, Sr. has been in the United States since 1948. The visa petition was filed as a preliminary to an application for adjustment of status.

---

[2] An obvious example is for an indigent alien.

24

While the file before us does not purport to examine the good moral character of the beneficiary, so far as known he may be able to qualify for suspension of deportation, and that avenue of relief may be open to him. For the reasons stated, I agree with the majority, that the present petition cannot be approved, but would deny solely because petitioner has failed to sustain his burden under *Matter of Brantigan*, 11 I. & N. Dec. 493 (BIA 1966).